UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DAVID FEUSI,

                Plaintiff,

    v.

CENTURION OF IDAHO, LLC;
DR. KATE WILKS; CHAD PAGE;
JOSH TEWALT; RANDY
VALLEY; and MARY STONER,

                Defendants.

Case No. 1:24-cv-00172-BLW

**MEMORANDUM DECISION AND ORDER**

Plaintiff David Feusi is a prisoner in the custody of the Idaho Department of Correction ("IDOC"). Plaintiff is proceeding pro se in this civil rights matter.

Plaintiff claims that, while incarcerated, he was denied adequate medical treatment with respect to shoulder injuries and testosterone supplementation.[1] Plaintiff initially was allowed to proceed on Eighth Amendment claims under 42 U.S.C. § 1983, as well as negligence or medical malpractice claims under Idaho

---

[1] Plaintiff appears to assert additional claims in his response to the Motion for Summary Judgment. *See, e.g.,* Dkt. 32 at 2 ("Centurion continues to refuse federal agencies access to my medical records to review treatment given or not."). Because these allegations were not included in the operative complaint, Plaintiff may not now raise any new claims based on them. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (upholding decision not to permit plaintiffs to raise new theories at the summary judgment stage, because the "complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations").

MEMORANDUM DECISION AND ORDER - 1

state law, against Defendant Centurion of Idaho, LLC—the private entity providing Idaho prisoners with medical care under contract with the IDOC—and several individual Defendants. *Init. Rev. Order*, Dkt. 3; *Succ. Rev. Order*, Dkt. 15. All claims against the individual Defendants have since been dismissed, leaving Centurion as the only remaining Defendant. *See* Dkt. 29.

Defendant Centurion has filed a Motion for Summary Judgment, which is ripe for adjudication.[2] Centurion argues Plaintiff cannot establish that Centurion (1) denied him adequate medical care in violation of the Eighth Amendment, with respect to treatment for his shoulder injuries and testosterone supplementation, or (2) committed negligence or medical malpractice under Idaho state law. *See generally Memo. in Supp. of Mot. Summ. J.*, Dkt. 30-1.

Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record and that oral argument is unnecessary. *See* D. Idaho Loc. Civ. R. 7.1(d). Accordingly, and for the reasons that follow, the Court will grant Defendant Centurion's Motion for Summary Judgment.

---

[2] Plaintiff suggests Defendant's Motion is premature, claiming that defense counsel "pushed so quickly to summary judgment." Dkt. 32 at 4. Plaintiff is mistaken. Dispositive motions were due on June 2, 2025. *See* Dkt. 15 (setting dispositive motion deadline for 300 days after August 6, 2024). Defendant filed the instant Motion for Summary Judgment on that date.

1.      **Standard of Law Governing Summary Judgment**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. Where, as here, the party moving for summary judgment would not bear the burden of proof at trial, that party may prevail simply by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

In resolving a summary judgment motion, the Court must consider the facts in the light most favorable to the non-moving party, unless the non-moving party's version of the facts is "blatantly contradicted by the record[] so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If such a blatant contradiction exists, then there is no "genuine" dispute as to that fact. *Id*.

The moving party bears the initial burden to show that each material fact cannot be disputed. Material facts are those "that might affect the outcome of the

suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Id*. at 247–48. Rather, a case will survive summary judgment only if there is a *genuine* dispute as to a *material* fact. *Id*. at 248. To show that the material facts are not in dispute, the moving party may cite particular parts of materials in the record or show that the nonmoving party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1).

If the moving party meets this initial responsibility, the burden then shifts to the non-moving party to establish that a genuine dispute as to any material fact does indeed exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Instead, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Statements in a brief, unsupported by the record, cannot be used to create a dispute of fact. *Barnes v. Indep. Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

The Court must consider "the cited materials" in considering a motion for summary judgment, but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb the record to find some

reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Rather, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

That is, "if a defendant moving for summary judgment has produced enough evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must counter by producing evidence of his or her own." *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004). In opposing a motion for summary judgment, the non-moving party must submit at least "some competent evidence," such as a "declaration, affidavit, [or] authenticated document," to support his allegations or to dispute the moving party's allegations. *Soto v. Sweetman*, 882 F.3d 865, 873 (9th Cir. 2018). If the non-moving party fails to produce such evidence, or if the evidence produced is insufficient, the Court is "not required (or even allowed) to assume that the challenged factual allegations in the plaintiff's complaint are true." *Butler*, 370 F.3d at 963.

Affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is

MEMORANDUM DECISION AND ORDER - 5

insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e). The Court must grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the parties. Although all reasonable inferences that can be drawn from the evidence must be drawn in the light most favorable to the non-moving party, *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987), the Court is not required to "draw unreasonable inferences from circumstantial evidence," *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

In cases involving pro se inmates, courts liberally construe the pleadings and briefs and "should avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, although pro se inmates are exempted "from *strict* compliance with the summary judgment rules," they are not exempted "from *all* compliance." *Soto*, 882 F.3d at 872.

MEMORANDUM DECISION AND ORDER - 6

## 2.      Factual Background

This section includes facts that are undisputed and material to the resolution of the issues in this case.[3]

### A.      *Treatment for Plaintiff's Shoulder Injuries*

On March 5, 2022, Plaintiff submitted a Health Services Request ("HSR"), stating that he might have torn his shoulder. *Stmt. of Mat. Facts in Supp. of Mot. for Summ. J.* ("*SOMF*"), Dkt. 30-2, ¶ 4. Plaintiff was evaluated the next day and given a pain relief cream. At that time, Plaintiff stated he did not believe further care was warranted. *Id.*

Several weeks later, Plaintiff submitted another HSR regarding his shoulder injury. A nurse came to Plaintiff's cell that same day to evaluate him. Plaintiff then requested an appointment with a provider. That examination occurred two weeks later, and an x-ray was ordered for Plaintiff's left shoulder. *Id.* ¶¶ 5–6.

Plaintiff was given the x-ray eight days later. The x-ray showed "minimal degenerative joint disease of the acromioclavicular joint." *Id.* ¶ 7. The

---

[3] The Court will adopt Defendant's Statement of Material Facts, *see* Dkt. 30-2, in considering the pending Motion for Summary Judgment. Plaintiff's allegations in response to Defendant's Motion (*see Pl's Memo. of Facts*, Dkt. 32) are deficient because they fail to cite admissible record evidence and because they are unsworn. *See Soto*, 882 F.3d at 872–73 (upholding grant of summary judgment against pro se inmate because the "only statements supporting [plaintiff's] ... argument are in his unsworn district court responses to the defendants' motion for summary judgment and to the district court's show-cause order"). Plaintiff simply has not gone beyond the pleadings and submitted evidence of his own. *See Butler*, 370 F.3d at 963. Because Plaintiff has failed to properly support his assertions and failed to properly address Defendant's assertions, the Court considers Defendant's factual allegations to be undisputed. *See* Fed. R. Civ. P. 56(e)(2). To the extent Plaintiff seeks to engage in additional discovery, *see* Dkt. 32 at 4, the Court has already ruled that discovery will not be reopened in this case, *see* Dkt. 36 at 2–6.

MEMORANDUM DECISION AND ORDER - 7

acromioclavicular joint connects the shoulder blade to the collarbone and appears as the bony prominence at the top of the shoulder.

Dr. Isaacs saw Plaintiff for a follow-up examination on April 26, 2022, only six days after the x-ray. Dr. Isaacs noted that the Plaintiff's left rotator cuff had been injured and prescribed Plaintiff 800 milligrams of ibuprofen. The doctor also stated that an MRI would be requested. *Id*. ¶ 8.

On April 30, Plaintiff reported pain in his other shoulder, the right shoulder. *Id*. ¶ 9.

In mid-May 2022, Plaintiff suffered an unrelated medical emergency. As a result, his vital signs were monitored for seven days. *Id*. ¶¶ 10–11.

Dr. Issacs evaluated Plaintiff again on May 24, 2022. Issacs requested an MRI of Plaintiff's left shoulder and stated he would consider a potential referral to an orthopedic surgeon. *Id*. ¶ 12.

On June 29, 2022, while the MRI order was still pending, Plaintiff reported that he had fallen in the shower and suffered pain in his right shoulder as a result. Plaintiff asked for a follow-up appointment with Dr. Isaacs to discuss pain medication. *Id*. ¶ 13.

On July 4, 2022, Plaintiff asked for an ice memo to help with his shoulder pain. A nurse practitioner agreed that ice would be appropriate and ordered the ice

MEMORANDUM DECISION AND ORDER - 8

memo. A little over a week later, Plaintiff's prescriptions for Tylenol and glucosamine were renewed. *Id*. ¶¶ 14–15.

Plaintiff was evaluated by a nurse practitioner on July 25, 2022. Plaintiff asked to be seen by Dr. Isaacs so Plaintiff could request "real pain medication" for his shoulder. Dr. Issacs renewed Plaintiff's then-current pain medication—ibuprofen, Tylenol, and the topical NSAID Voltaren Gel—in September 2022 but denied Plaintiff's request for other pain medication. *Id*. ¶¶ 16, 18.

In November 2022, Plaintiff was evaluated by a nurse for his shoulder pain. The nurse submitted a follow-up request regarding Plaintiff's right shoulder and Plaintiff's request for a prescription for the opioid Tramadol. *Id*. ¶ 19.

Plaintiff began suffering involuntary muscle contractions in his left shoulder and forearm. On December 6, 2022, a nurse offered Plaintiff a muscle rub or capsaicin (a topical pain reliever) for the pain, but Plaintiff refused. The nurse also ordered an x-ray of Plaintiff's right shoulder. *Id*. ¶ 20.

The x-ray of Plaintiff's right shoulder took place two days later, on December 8. That x-ray showed "moderate osteoarthritis of the glenohumeral joint [the ball-and-socket joint of the shoulder] and acromioclavicular joint[,] with small marginal osteophytes [bony growths] along the inferior margin of the glenohumeral joint, as well as significant degenerative changes in the cervical spine." *Id*. ¶ 21. A second x-ray of Plaintiff's right shoulder (in January 2023)

MEMORANDUM DECISION AND ORDER - 9

"revealed degenerative joint disease of the glenohumeral joint and a suspected rotator cuff tear." *Id.* ¶ 23.

On December 12, 2022, Plaintiff underwent an offsite MRI of his left shoulder. Dr. Ballard reviewed the MRI and, on February 3, 2023, "requested an orthopedic evaluation to determine if surgical intervention was appropriate and also requested physical therapy in the interim." *Id.* ¶¶ 22, 24.

On February 8, 2023, Dr. Isaacs again examined Plaintiff. The doctor prescribed Tramadol and renewed Plaintiff's Tylenol and ibuprofen. Dr. Isaacs also requested an MRI of Plaintiff's right shoulder, which took place on March 8, 2023. Meanwhile, Plaintiff attended physical therapy and stated that his pain had improved. *Id.* ¶¶ 25–27.

On March 9, 2023, Dr. Jurgensmeier, an orthopedic doctor at St. Alphonsus, concluded that Plaintiff's right rotator cuff injury was "likely too significant for repair." *Id.* ¶ 28 (internal quotation marks omitted). Because Plaintiff was too young for a "reverse total shoulder arthroplasty," Dr. Jurgensmeier recommended an injection and physical therapy. *Id.*

Plaintiff submitted an HSR on March 23, 2023, asking about the treatment plan for his shoulder injuries. Three days later, a nurse evaluated Plaintiff and stated that Plaintiff's current pain management plan would continue until Plaintiff's next appointment with a provider. *Id.* ¶ 29. At a physical therapy session

that same day, Plaintiff stated that he requested a second opinion regarding his shoulder injuries and asked to be seen by Dr. Curtin, not Dr. Jurgensmeier. *Id*. ¶ 30.

On June 23, 2023, Plaintiff was examined by Dr. Ballard. Ballard decided that Plaintiff did not need additional pain medication and referred Plaintiff to an orthopedist. *Id*. ¶ 31.

Plaintiff saw Dr. Jurgensmeier on September 21, 2023. Plaintiff received an ultrasound-guided injection of his left biceps muscle and glenohumeral joint. *Id*. ¶¶ 32–33.

Dr. Jurgensmeier evaluated Plaintiff again on January 17, 2024, concluding that Plaintiff had "chronic irrepairable [sic] rotator cuff tears on the right and has minimal cuff tendinopathy/biceps tendinopathy on the left." *Id*. ¶ 38. Jurgensmeier identified the potential treatment options as a reverse total shoulder arthroplasty on Plaintiff's right shoulder and "comprehensive rehabilitation" for his left shoulder. *Id*. Plaintiff had another follow-up appointment on January 23, 2024, during which Dr. Jurgensmeier noted that the left shoulder imaging showed "preserved joint space and alignment." *Id*. ¶ 39; *Ex. A to Decl. of Mary Stoner* ("Stoner Decl."), Dkt. 30-3, CENT 004254.

MEMORANDUM DECISION AND ORDER - 11

On February 2, 2024, Plaintiff was evaluated by a nurse practitioner, who stated that Plaintiff was not a good candidate for shoulder surgery because of his age and opioid use. *SOMF* ¶ 41; *Ex. A. to Stoner Decl.*, CENT 000283.

On March 8, 2024, a physician's assistant evaluated Plaintiff regarding his shoulder pain. The provider noted that Plaintiff had "irreparable rotator cuff tears in his right shoulder and minimal rotator cuff tendinopathy/biceps tendinopathy in his left shoulder." *SOMF* ¶ 43. Plaintiff requested repeat MRIs for both shoulders and asked for a second opinion from an orthopedic doctor. *Id*.

On March 19, 2024, Plaintiff had an appointment with Dr. Juchau, who confirmed that Plaintiff would be given a second MRI of each shoulder. The doctor noted that a second orthopedic opinion would be considered after the MRIs. *Id*. ¶ 44. During Plaintiff's evaluation a few weeks later, Dr. Juchau again noted that additional options would be considered after the repeat MRIs. The doctor also prescribed Tramadol for one month. *Id*. ¶ 45.

The new MRIs, on both shoulders, were performed on April 23, 2024. *Id*. ¶ 46. Less than two weeks later, a provider reviewed the MRI results with Plaintiff and requested a second orthopedic consultation. *Id*. ¶ 47. That offsite consultation, with Dr. Clark, occurred on July 17, 2024, after Plaintiff filed the operative Amended Complaint in this case. Dr. Clark discussed non-surgical treatment options with Plaintiff, though Plaintiff stated he might ask about surgical

MEMORANDUM DECISION AND ORDER - 12

intervention in the future. Dr. Clark opined that any delay in considering surgery would *not* adversely affect Plaintiff's potential surgical outcome and noted that Plaintiff agreed with Dr. Clark's "plan of care." *Id*. ¶ 48.

A nurse practitioner examined Plaintiff on August 21, 2024, and considered Plaintiff's request for the medication Lyrica. The provider denied the request, concluding that Lyrica was not medically necessary. Plaintiff refused the offer of other pain medication, insisting that he wanted only Lyrica. *Id*. ¶ 49; *Ex. A to Stoner Decl*., CENT 004418–004421. Plaintiff's ibuprofen and Tylenol prescriptions were renewed in October 2024. *SOMF* ¶ 50.

### B.    *Plaintiff's Testosterone Supplementation*

In addition to claims involving his shoulder pain, Plaintiff also asserts that Dr. Wilks, who has been dismissed from this action, improperly discontinued Plaintiff's testosterone injections in October 2023. *Am. Compl*., Dkt. 7-2, at 8. Dr. Wilks decided that the injections were no longer medically necessary because there was no information in Plaintiff's records about his baseline testosterone levels. *SOMF* ¶ 34. The lack of baseline levels presumably resulted from the fact that Plaintiff had been taking testosterone injections since before he was incarcerated. *See Am. Compl*. at 8 ("I was stable [on the testosterone injections] for 16 years.").

Another reason Dr. Wilks gave for taking Plaintiff off the testosterone supplementation was that "the one clinically significant outcome of testosterone

supplementation is increased sexual function, which is not a treatment goal in corrections." *SOMF* ¶ 34. Finally, Dr. Wilks noted that the prescription opioid Plaintiff was taking for his shoulder pain could have been suppressing his testosterone, which "increase[ed] his risk of adverse effects from polypharmacy." *Id*.

When Plaintiff later submitted an HSR about being denied testosterone supplementation, Dr. Culpepper noted that Plaintiff's most recent testosterone level was normal but ordered a repeat testosterone test. *Id*. ¶ 35. That test revealed a low level of testosterone, so Plaintiff was scheduled for a follow-up appointment. *Id*. ¶ 36.

Dr. Wilks evaluated Plaintiff on January 5, 2024, and discussed with him "the lack of clinically significant improvement in outcomes from testosterone replacement." *Id*. ¶ 37. Once again, Dr. Wilks stated that the increase in sexual function that results from testosterone supplementation was not a treatment goal in prison.

Plaintiff's testosterone level was next tested on February 2, 2024. That test revealed that Plaintiff's testosterone level was "improving overall," with Plaintiff's "free and bioavailable testosterone testing within reference ranges and his total serum testosterone falling one point below reference range." *Id*. ¶ 38.

3.      **Standards of Law Applicable to Plaintiff's Claims**

   A.      *Eighth Amendment Claims*

Plaintiff brings his Eighth Amendment claims under 42 U.S.C. § 1983, the civil rights statute. To state a plausible civil rights claim, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). A defendant causes a constitutional deprivation within the meaning of § 1983 "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

The Eighth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, protects prisoners against cruel and unusual punishment and guarantees prisoners the right to minimally adequate conditions of confinement. To state a claim under the Eighth Amendment, a prisoner must plausibly allege that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of the defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires the plaintiff to satisfy both (1) an objective

MEMORANDUM DECISION AND ORDER - 15

standard, "that the deprivation was serious enough to constitute cruel and unusual punishment," and (2) a subjective standard, that the defendant acted with "deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

The Eighth Amendment includes the right to adequate medical treatment in prison. Prison officials and prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for prisoners' medical care claims, "society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Therefore, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ....

MEMORANDUM DECISION AND ORDER - 16

*McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, "deliberate indifference entails something more than mere negligence, … [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. A prison official or prison medical provider acts with deliberate indifference "only if the [prison official or provider] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (internal quotation marks omitted), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (footnotes omitted). Though a delay in medical treatment can violate an inmate's right to adequate

MEMORANDUM DECISION AND ORDER - 17

prison medical care, the inmate must establish that the delay caused further harm. *McGuckin*, 974 F.2d at 1060.

Medical malpractice or negligence does not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). Additionally, there is no constitutional right to an outside medical provider of one's own choice. *See Roberts v. Spalding,* 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution.").

"If a [prison medical provider] should have been aware of the risk, but was not, then the [provider] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188. Moreover, even prison medical providers who *did* know of a substantial risk to an inmate's health may not be liable under § 1983 "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. If medical personnel have been "consistently responsive to [the inmate's] medical needs," and the plaintiff has not shown that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061.

MEMORANDUM DECISION AND ORDER - 18

"There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal quotation marks omitted). Mere differences in judgment as to appropriate medical diagnosis and treatment between an inmate and prison medical providers—or, for that matter, between medical providers—are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Accordingly, prison medical providers do not act with deliberate indifference solely by disagreeing with an outside doctor's treatment recommendation or by choosing a treatment different from that requested by an inmate.

"[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). Stated another way, a plaintiff must prove that medical providers chose one treatment over the plaintiff's preferred treatment "even though they knew [the plaintiff's preferred treatment] to be medically necessary based on [the plaintiff's] records and prevailing medical standards." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1117 (N.D. Cal. 2015). To violate the Eighth Amendment, the medical provider's

choice of treatment must have been "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998); *see also Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018) ("[P]rison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants.").

A plaintiff asserting a § 1983 claim against a local governmental entity or a private entity performing a government function, such as Centurion, must establish that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains, as required by *Monell v. Department of Social Services of New York*, 436 U.S. 658, 694 (1978). *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities performing a government function). Under *Monell*, the requisite elements of a § 1983 claim against such an entity are the following: (1) the plaintiff was deprived of a constitutional right; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

MEMORANDUM DECISION AND ORDER - 20

An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

### B.    State Law Claims

To prevail on a negligence claim under Idaho law, a plaintiff "must establish the following elements: '(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage.'" *Jones v. Starnes*, 245 P.3d 1009, 1012 (Idaho 2011) (quoting *Hansen v. City of Pocatello*, 184 P.3d 206, 208 (Idaho 2008)). A person breaches a duty owed to the plaintiff, and thus commits negligence, if that person acts in a manner in which a reasonable person would not. *See Steed v. Grand Teton Council of the Boy Scouts of Am., Inc.*, 172 P.3d 1123, 1128–29 and n.3 (Idaho 2007) (describing the reasonable person standard as the "negligence standard of care").

A medical malpractice claim is a type of negligence claim asserted against health care providers. To establish a breach of the duty to provide adequate medical treatment, a plaintiff asserting a medical negligence claim must "affirmatively prove[,] by direct expert testimony and by a preponderance of all the competent evidence," that the defendant medical provider "negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided." Idaho Code § 6-1012. To establish a failure to meet the community health care standard, the plaintiff must present a "knowledgeable, competent expert witness[]" who can testify, to a reasonable degree of medical certainty, as to the community standard of care. Idaho Code § 6-1013.

**4.    Defendant Centurion Is Entitled to Summary Judgment on Plaintiff's Eighth Amendment Claims**

### A.    *Plaintiff Received Adequate Medical Care for His Shoulder Injuries and Testosterone Levels*

As the above factual recitation reveals, each time Plaintiff complained of pain in his shoulders, medical staff responded. Plaintiff was seen several times by off-site specialists. Plaintiff received x-rays, multiple MRIs, pain medication, physical therapy, and an injection. Defendant has correctly pointed out that there is no evidence in the record supporting a reasonable inference that Plaintiff's medical treatment for his shoulder injuries was the result of deliberate indifference.

MEMORANDUM DECISION AND ORDER - 22

Plaintiff has submitted no evidence in response and, thus, has failed to meet his burden of establishing the existence of a genuine dispute of material fact. That Plaintiff did not see the provider he preferred, or that he wanted different treatment, does not establish deliberate indifference under the Eighth Amendment. *See Roberts,* 783 F.2d at 870; *Sanchez*, 891 F.2d at 242.

Defendant has also met its initial burden of showing that the discontinuation of Plaintiff's testosterone supplementation did not violate the Eighth Amendment. There is no evidence that Dr. Wilks acted with deliberate indifference when she took Plaintiff off the testosterone. Plaintiff's base testosterone levels were improving and ended up only one point below the normal range. Moreover, increased sexual function—which is the primary clinical outcome of testosterone supplementation—is not a goal in correctional medicine. Plaintiff has submitted no evidence establishing the existence of a genuine dispute of material fact as to his testosterone supplementation.

For these reasons, Defendant Centurion is entitled to summary judgment on Plaintiff's § 1983 claims of inadequate medical treatment.[4]

---

[4] Plaintiff suggests that Centurion has been accused of, and is being investigated for, inadequate medical treatment in many other cases and many other states. *See* Dkt. 32 at 2, 13. Even if these unsworn statements were admissible in evidence, they would not alter the Court's analysis. Assuming Centurion or its providers are being investigated by federal agencies for more widespread inadequate medical treatment, the care Plaintiff received in this case *was* adequate. Plaintiff was seen repeatedly by prison doctors and outside medical specialists, and his health care providers tried a variety of remedies. Evidence of inadequate treatment in other cases would not affect the outcome of this case.

MEMORANDUM DECISION AND ORDER - 23

> **B.**     ***Even If Plaintiff Did Not Receive Adequate Medical Treatment, He Cannot Show that Such Treatment Was the Result of a Policy, Practice, or Custom of Defendant Centurion as Required by*** **Monell**

Even if Plaintiff could show that he received inadequate medical treatment, which he cannot, Defendant Centurion still would be entitled to summary judgment. Centurion has met its initial burden of pointing out that there is no evidence of a policy, custom, or practice of denying adequate medical treatment— as to either Plaintiff's shoulder or testosterone treatments—as required by *Monell*, 436 U.S. at 694, and Plaintiff has not submitted any such evidence in response. Plaintiff's conclusory assertion that there "appears to be some sort of policy … of be[ing] reactive to medical needs, instead of a proactive approach to medicine," Dkt. 32 at 10, is not supported by any evidence and does not establish a genuine dispute of material fact. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) ("It is the conclusory nature of [the plaintiff's] allegations, rather than their extravagantly fanciful nature … that disentitles them to the presumption of truth.") (Rules 8(a) and 12(b)(6) context).

Rather than acting pursuant to a Centurion policy, custom, or practice, the "obvious alternative explanation" is that Plaintiff's medical providers each made their own decisions about Plaintiff's treatment in the exercise of their independent medical judgment. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007) (Rules

8(a) and 12(b)(6) context). Accordingly, summary judgment on Plaintiff's federal claims must be granted on this additional basis.

**5.      Defendant Centurion Is Entitled to Summary Judgment on Plaintiff's State Law Claims**

As explained above, a plaintiff asserting a medical negligence claim must provide evidence as to the standard of health care practice in the community. Idaho Code § 6-1012. Defendant has met its initial burden by pointing out a lack of admissible evidence as to that standard of health care practice. Plaintiff cannot prevail on his state law claims because he has not provided any such evidence.

Plaintiff has not identified an expert witness who can opine as to the health care standard as required by Idaho Code § 6-1013. Nor do Plaintiff's own unsworn statements suffice. *See Soto*, 882 F.3d at 872–73. Moreover, Plaintiff has not established that he is qualified to testify as an expert under Federal Rule of Evidence 702. Thus, Plaintiff has not met his burden of presenting a genuine dispute of material fact as to whether Defendant breached the community standard of care, and summary judgment must be granted on Plaintiff's state law claims.

**CONCLUSION**

For the reasons explained above, Defendant Centurion is entitled to summary judgment on all of Plaintiff's claims.

## ORDER

**IT IS ORDERED** that Defendant Centurion's Motion for Summary Judgment (Dkt. 30) is GRANTED. Because Plaintiff's claims against all other Defendants have already been dismissed, final judgment will be entered in favor of all Defendants.

DATED: March 17, 2026

B. Lynn Winmill
U.S. District Court Judge